THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
RONALD FORT *et al.*, Defendants-Appèllants.

Second District (2nd Division)    No. 75-30

Opinion filed December 3, 1976.

Ralph Ruebner and J. Daniel Stewart, both of State Appellate Defender's Office, of Elgin, and John McNamara, of Rockford, for appellants.

Philip G. Reinhard, State's Attorney, of Rockford (Edward N. Morris and Martin P. Moltz, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE RECHENMACHER delivered the opinion of the court:

The defendants were charged with burglary, convicted by a jury and sentenced to serve not less than 1 nor more than 5 years in the penitentiary. Fricks and Nelson appeal on the grounds (1) that they were not proven guilty beyond a reasonable doubt because the testimony of the State's chief witness was vague, uncertain and rebutted by defendants' evidence, (2) that the trial court erred in permitting the prosecutor in his closing argument to make improper and prejudicial remarks, not based on the evidence at trial.

Defendant Fort appeals only on the second ground indicated above.

The apartment of Ace Hawthorne in the Valerie Percy Apartments in Rockford was burglarized on November 15, 1973. Ace Hawthorne was at work at the time but his sister, Geraldine, aged 16, testified as an eyewitness. She said that she had just left her brother's apartment and was on the back stairs when she heard kicking at the front door of the apartment. She continued on down and hid behind a jutting brick portion of the building wall (apparently alongside the stairwell) from which point she could observe the back door of Ace's apartment without being seen. She testified that very shortly after hearing the noise she saw the defendants coming out of the back door of the apartment with various objects in their hands, Murray with the "tape-player", Fort with a record player and Fricks carrying two lamps and a bow and arrow set. (Two other persons were arrested in this connection but they are not involved in the appeal here but were identified by Geraldine as carrying other property, including a TV set.)

Geraldine testified that there was enough light for her to identify the burglars, and that she knew all of them by sight and by name. The testimony indicated that the persons identified by Geraldine were members of a group or gang which she referred to as "The Disciples" and that they sometimes gathered at the apartment of Linda Jordan, which was next door to that of Ace Hawthorne. Geraldine, after observing the burglary, went to her mother's apartment nearby and told her what she had seen. When Ace returned from work and found that the apartment had been burglarized he called the police and signed a complaint.

The five suspects were arrested within a few days of the burglary, except Murray who left the Rockford area immediately following the burglary but returned and was arrested on November 30. The police interrogated the suspects after informing them of their constitutional rights in accordance with the *Miranda* requirements. All acknowledged being so informed and all signed a waiver of their right to remain silent and answered questions by the police, except one who is not an appellant here. According to the police reports and testimony Fort admitted he participated in the burglary and that he took a TV set from the apartment and sold it to a girl of his acquaintence by the name of Vicki Meadows.

The police went to her apartment and after first denying she had the set, she produced the set and handed it over to the police. Fort refused to name anyone else who was involved. At the trial he denied he had admitted the burglary and denied that he had participated in it. He said he only told the police the address of Vicki Meadows and they already knew that she had the TV set, having been told this by some other person.

Defendant Murray denied any part in the burglary, however, he signed a statement admitting that he had gone to Ace Hawthorne's apartment on November 17, two days after the alleged burglary, that he had found the door open and had taken a couple of "Afro" statues and two incense holders. Frick completely denied any part in the burglary and the police reports do not indicate that he signed any incriminating statements.

The defendants Murray and Fricks base their contention that the evidence was not sufficient to prove them guilty beyond a reasonable doubt on an alleged discrepancy in the testimony of Geraldine Hawthorne. Geraldine testified that she witnessed the burglary from a vantage point on the ground, near the stairs, where she was partly hidden by a brick projection of the building wall. Apparently as a result of police interrogation and after looking at a photograph, Geraldine indicated a certain spot on the photograph as the place where she had been standing when she observed the defendants coming out of the back door of the apartment with Ace's property in their hands.

To rebut her testimony the defense called the maintenance superintendent of the Valerie Percy Apartment Complex, Willis Scott. After looking at the photographs designated as People's exhibits 2 and 3 and defense exhibit 1, Scott testified that due to the construction of the stairways and stairwells, Geraldine Hawthorne could not have seen the back door of Ace Hawthorne's apartment from the spot she indicated on the photographs to mark the place where she was standing when she observed the defendants. Scott said that that point would not have allowed a view of Ace's back door. Geraldine, recalled to the stand by the prosecution in rebuttal, reiterated that she had seen the defendants "take the stuff out of Ace's house."

The defense contends that since Geraldine is the only person to place the defendants at the scene of the burglary and since her testimony was shown by a defense witness to be incredible, her testimony should be disregarded and in that case there is not sufficient evidence to convict the defendants beyond a reasonable doubt.

■■ However, in our view, it is not necessary to conclude from Scott's testimony that Geraldine was not telling the truth when she said she saw the defendants coming out of Ace's apartment carrying certain property. The jury had the opportunity of believing either that she did not witness what she said she witnessed or that she merely designated the wrong spot on the photograph as the place where she was standing when she

witnessed it. Apparently the jury, based on the prompt police report, the testimony as to the condition of the apartment and the recovery of the TV set by the police, believed that a burglary by the defendants had occurred and that Geraldine had witnessed it and they disregarded the apparent error as to where Geraldine was standing when she observed it. Inasmuch as the defendants admitted they were in the habit of gathering in the apartment next door to Ace's and there were references in the police report as to friction between some of the defendants and Ace Hawthorne and his testimony indicated that some of the same group had burglarized or attempted to burglarize his apartment previously, and inasmuch as Detective Otwell testified that Fort had admitted he participated and divulged the name and address of the person having the stolen TV set, it was reasonable for the jury to come to the conclusion that Geraldine was honest in her testimony and that the defendants were involved in the burglary. For the jury to have disregarded the circumstances pointing to their involvement and come to the conclusion that some entirely unrelated and unknown person had been responsible would, in view of the total evidence against the defendants, be contrary to reason and experience. We believe the jury had sufficient evidence before it to have found the defendants guilty beyond a reasonable doubt.

The defendants next contend that they were unduly prejudiced by inflammatory and prejudicial remarks made by the prosecutor which were not derived from the evidence at trial. This contention is based on the reference by the prosecutor to "threats" made to Geraldine and the inference that the defendants or some of them had made such threats, which they would not have done had they been innocent of any involvement. In the beginning of his argument the State's Attorney asked rhetorically, "Did we hear about any threats when their people were testifying," but was cut off by an objection at that point and the objection was sustained by the trial court. The background of the prosecutor's remarks was a conversation which Geraldine testified to between her and a friend, Sandra Wishburn, who was engaged to marry one of the co-indictees. Sandra, Geraldine testified, asked her if she was going to testify against the "D's [Disciples]" and when Geraldine replied she was, Sandra said, "[Y]ou know, what can happen to you if you testify against the D's." In the course of his argument the State's Attorney said, "[N]ow we've got threats made to Geraldine, that's evidence of guilt." He was proceeding to enlarge on this theme of threats being an implication of guilt when defense counsel objected on the ground that there was no testimony that any of the defendants on trial had ever made any threats, which objection was sustained by the trial court. The prosecutor then stated that the actual testimony was that a girl friend of Mitchell Owens (a co-indictee) had said to Geraldine, "[Y]ou know, what can happen to you if you testify against the D's." Defense counsel again objected saying, "I object, this

does not effect something that is completely out of the control of any of these witnesses, any of these defendants." The court replied it was "an inference that may be drawn" and that "his statement of the testimony is fair and reasonable."

Thus we have mention of a threat, which was objected to and the objection sustained. Later on in the argument another mention was made of a threat and this was sustained as to any implication that any of the defendants made such a threat. To this the State's Attorney replied by a remark summarizing the testimony on that point, which the court said was a "fair and reasonable" statement and which we must agree was substantially a correct summary of the testimony. We do not believe these remarks in the context set forth were so prejudicial as to constitute reversible error.

■■ ■ The defendants invoke the recent case of *People v. Weathers* (1975), 62 Ill. 2d 114, where our Supreme Court granted a new trial because of extremely prejudicial remarks made by the State's Attorney in his closing argument. However, in our opinion, the prejudice from the prosecutor's argument in that case was much more flagrant than in the case before us, both as to prejudicial references to the defendant and in the introduction of statements not in any way derived from the evidence. A prosecutor is allowed some latitude in his closing argument. In the *Weathers* case he far exceeded permissible limits. In the case before us there was no doubt impropriety but the question is not whether the closing argument was proper but whether it reached a magnitude of impropriety which deprived the defendants of a fair trial. We see no parallel between this case and the *Weathers* case on the question of prejudicial remarks.

■■ The contention is also raised in the appellants' brief that impeachment testimony was commented on in the State's closing argument as if it were substantive testimony relevant to the guilt or innocence of the defendants. The defense cites the case of *People v. Collins* (1971), 49 Ill. 2d 179, and the opinion of this court in *People v. Coagan* (1975), 28 Ill. App. 3d 634, in support of this contention. We note this point was not raised in the oral argument and we give it only passing consideration here because we believe the facts in this case do not involve the use of impeachment evidence for substantive purposes as was true in the cases cited by the defendants. The evidence referred to as impeaching evidence was the statement made by Geraldine Hawthorne to the effect that Sandra Wishburn had said to her in the course of a conversation about her intention to testify against the defendants, "[Y]ou know, what can happen to you if you testify agains the D's." This statement was in no way impeachment of Sandra. Whether it could have been objected to as violating the hearsay rule we need not consider since it was not objected

to on that ground. In any event, we do not consider the argument raised in the appellants' brief on this point as being valid since Geraldine's statement did not impeach Sandra's testimony in any way.

The defense also complains that the prosecutor injected himself personally into the case in attempting to secure the sympathy of the jury. While this practice has been condemned generally, the personal element here was at least partly provoked by defense counsel's prior inference that the State's Attorney was motivated to seek convictions because "there is some perhaps reward for prosecutors in convicting people." While he may have overshot the mark in vindicating himself when he attempted to identify his role with that of the jury, some leeway must be allowed the prosecutor when it is suggested that he might have deliberately altered the truth and that there is a reward for prosecutors in convicting people. The prosecutor's remarks certainly were not on a par with such obviously unfair statements as that made by the State's Attorney in *People v. Vasquez* (1972), 8 Ill. App. 3d 679, 681, where the State's Attorney said to the jury, " 'I am just the thirteenth juror in the case * * *'." The remarks in the case before us, such as "I represent you. He [defense counsel] represents Fort and Fricks," while improper, did not in our opinion constitute such improper conduct as to justify a reversal based on that consideration alone, inasmuch as the remarks were, in our opinion, provoked. Had the prosecutor not commented on the innuendoes of the defense counsel as to his opportunism and disregard of the truth the State would not have been well served. Defense counsel suggested in his closing argument that the prosecutor realized after the trial began that he had no case but that he decided, "we'll convict them anyway." This implies that the State's Attorney knew from the evidence that the defendants were not guilty. In view of this attack on his integrity the remark of the prosecutor, "Believe me, if I were not here presenting the truth I would not be here. I would have by now ended this case as I have the power to do," was a natural reaction and should not be considered in isolation but rather as part of the total argument by both sides. So viewed, the personal note interjected by the State's Attorney, while it was improper (*People v. Provo* (1951), 409 Ill. 63), must be regarded as defensive rather than as deliberately prejudicial. We are aware it has been held in some cases that it is reversible error for the prosecutor to express his opinion of the defendant's guilt (*People v. Fuerback* (1966), 66 Ill. App. 2d 452). However, our Supreme Court in stating this rule in *People v. Hoffman* (1948), 399 Ill. 57, recognizes that it is not improper if based on the evidence marshalled by the State's Attorney. See *People v. Reyes* (1970), 131 Ill. App. 2d 134 and *People v. Jennings* (1973), 11 Ill. App. 3d 132.

Moreover, this remark was not objected to by defense counsel and is

subject to the familiar rule that remarks by counsel during closing arguments which are not objected to are waived. *People v. Underhill* (1967), 38 Ill. 2d 245; *People v. Sinclair* (1963), 27 Ill. 2d 505.

■■ While not condoning the conduct of the State's Attorney in this case we believe its effect was not so prejudicial as to merit reversal. We find the language in *People v. Smith* (1972), 6 Ill. App. 3d 259, 263, particularly appropriate to the facts of the case before us:

> "In determining whether a prosecuting attorney's argument to a jury is prejudicial, reference must be made to the context of the language, its relation to the evidence and the effect of the argument on the rights of the accused to a fair and impartial trial. We have made this reference by a review of the record and conclude that the prosecutor's expression of belief in defendant's guilt was a conclusion drawn from the evidence. In this context, the argument was permissible. * * * In claiming that prejudicial argument was used in his prosecution, a defendant has to show that his rights were substantially prejudiced. He must show that the questionable language, considered in light of all the evidence of guilt, was a material factor in the conviction and that the verdict or finding would have been different had the language not been used."

In the case before us we are not persuaded that the prosecutor's remarks were at all decisive in convicting the defendants. It appears to us the case rested almost entirely on whether the jury believed the testimony of the eyewitness, Geraldine Hawthorne. Obviously the State's Attorney relied on her testimony as being conclusive. If the jury had not believed her testimony it is highly unlikely they would have returned a guilty verdict merely because the State's Attorney remarked that if he had not believed the defendants guilty he would have dismissed the case. On the other hand, if he had remained entirely silent as to the defendants' guilt there is no reason to suppose the jury would have taken any cue from this—if they believed Geraldine's testimony. Her testimony was the all-important element in the case. Whether the jury believed it or not was controlling. Viewed in this light we do not consider the remarks objected to as being of critical importance.

After careful consideration we are of the opinion the questionable remarks of the State's Attorney, considering all the aspects of the situation, were not so prejudicial as to deprive the defendants of a fair trial.

Accordingly, the judgment of the circuit court of Winnebago County is affirmed.

Judgment affirmed.

SEIDENFELD and GUILD, JJ., concur.