THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JAMES MOORE, Defendant-Appellant.

Third District   No. 77-96

Opinion filed December 27, 1977.

Robert Agostinelli and Mark W. Burkhalter, both of State Appellate Defender's Office, of Ottawa, for appellant.

Edward Petka, State's Attorney, of Joliet (George W. Chabalewski, Assistant State's Attorney, of counsel), for the People.

Mr. PRESIDING JUSTICE ALLOY delivered the opinion of the court:
Defendant James Moore appeals from a conviction of rape in the Circuit Court of Will County following a jury trial. Defendant was sentenced to a term of 15 to 30 years imprisonment. On appeal in this court defendant argues simply that the identification of defendant by the

rape victim should have been suppressed as being the fruit of an illegal stop.

We note from the record that on October 16, 1975, the Will County grand jury returned an indictment charging defendant Moore with the offense of rape in violation of section 11—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 11—1). Prior to the trial, defendant filed a motion to suppress identification testimony, upon which a hearing was held. Testimony at the suppression hearing established that on August 26, 1975, Juannelle Ritchie was the victim of an armed robbery at her place of employment, an office in a four-store-front shopping center in Lockport, Illinois. On the night of the robbery, Ritchie described the black male robber to police officers. She also related to the investigating officers that she observed the robber at or near her place of employment on three occasions within two weeks prior to the robbery.

It appears that about two weeks prior to the robbery, the perpetrator of the robbery entered Ritchie's office at about 10:40 p.m. and requested to speak with a salesman, and then left without giving his name. On the second occasion, the man approached the locked office door shortly after 8 p.m. and Ritchie informed him that if he would return the next day he could speak with a salesman. On the night prior to the robbery and shortly after Ritchie's purse had been stolen, Ritchie observed the robber sitting in an automobile in the parking lot outside her office at approximately 10:50 p.m. Ritchie was able to view the back and passenger sides of the automobile and the profile of its occupant, whom she stated she recognized as a man who had earlier approached her office. Because she was nervous, Ritchie looked out of her office window three or four times to see if the car and its occupant remained in the lot. While she was unfamiliar with automobile models, Ritchie described the vehicle occupied by the robber as a late model reddish orange car, similar to a Vega, with silver hubcaps and two broad white stripes running down the trunk area, each stripe being seven or eight inches wide and with the stripes located about one-half inch apart. Ritchie did not see the vehicle on the night of the armed robbery.

The evidence at the suppression hearing also established that on September 8 or 12, 1975, at about 6 p.m., Will County sheriff's deputies Pavnica, in one squad car, and Kontos and Simpson, in another squad car, were on patrol near Route 171 in Lockport, when Deputy Pavnica, who had interviewed Ritchie regarding the armed robbery, observed an automobile matching the description of the vehicle associated with the armed robber. It appears that the orange Vega sighted by Pavnica had an 18-inch-wide stripe running down the back, with a one-inch-wide stripe on either side, and that the vehicle was being driven by a black male. Due to the fact that Pavnica knew that there were not many cars of similar

description in the area driven by black males, Pavnica proceeded to pursue and stop the vehicle. Prior to making the stop, the officer noted the vehicle license number of the Vega. Officers Kontos and Simpson assisted Pavnica in making the stop. Pavnica then checked the identification of defendant, who was the driver of the car. Pavnica noted that defendant matched Ritchie's description of the robbery suspect. Defendant, however, was not placed under arrest, but was requested to go to the police station to be photographed. Defendant agreed to do so and proceeded in his own car to the police station, where his photograph was taken. Deputy Pavnica testified, also, that a check on the license number of defendant's vehicle revealed that the vehicle was registered to defendant, and that the Will County sheriff's files contained a picture of defendant dated November 29, 1973. The testimony of Joanne Harrison, the victim of the rape offense with which we are concerned, indicated that on September 19, 1975, she viewed the photograph taken of defendant Moore (following the stop by the Will County sheriff's deputies) and that from that photograph she recognized defendant as her assailant. At the conclusion of the suppression hearing, the trial court denied defendant's motion, and found that the stop of defendant by the officers had not been illegal, and that defendant had consented to having his picture taken.

The evidence at the jury trial on the rape charge established that on the morning of September 18, 1975, Joanne Harrison, while in her mother's house in Joliet, answered the door and encountered a black man who pulled a gun on her and entered the house. The man tied Harrison's hands and forced her to submit to sexual intercourse. Subsequently, the man tied Harrison's legs and gagged her, and left the house taking with him Harrison's automobile, purse, wallet and driver's license. Harrison identified defendant at trial as her assailant. It also appears that Joliet police executed a search warrant on defendant's apartment on September 19, 1975, and discovered in the apartment, Harrison's driver's license, a hand gun and some rope. Following presentation of the evidence, the jury found defendant guilty of rape, and, following a sentencing hearing, the trial court sentenced defendant to a term of from 15 to 30 years imprisonment.

■■■ Defendant argues on the instant appeal that the identification testimony of Harrison should have been suppressed as the fruit of an illegal stop of defendant, for the reason that the officers stopping defendant did not have sufficient cause to make the stop. As this court stated in *People v. Ussery* (3d Dist. 1974), 24 Ill. App. 3d 864, 867-68, 321 N.E.2d 718:

> "The curbing of a car is not an arrest of the driver. An arrest involves three elements: (1) authority to arrest; (2) assertion of that

authority with intention to effect an arrest; and (3) restraint of the person to be arrested. [Citations.] When one is approached by a police officer to be questioned about her identity and actions, this is only an accosting, not an arrest. [Citation.] The act relied on as constituting an arrest must have been performed with the intent to effect an arrest and must have been so understood by the party arrested. [Citations.]"

In the instant case, testimony at the suppression hearing established that, after curbing defendant's car, the officers merely checked defendant's identification and requested his compliance in having a picture taken. He agreed to have his picture taken. Defendant was not frisked at the roadside, and defendant asked, and was informed, that he was not under arrest. We concur in the trial court's conclusion that the action of the officers in curbing defendant's car was not an arrest, but an investigatory stop.

With respect to investigatory stops, section 107—14 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1975, ch. 38, par. 107—14) provides:

"A peace officer, after having identified himself as a peace officer, may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person * * * has committed an offense * * *, and may demand the name and address of the person and an explanation of his actions. Such detention and temporary questioning will be conducted in the vicinity of where the person was stopped."

With respect to an investigatory stop pursuant to this provision, the Illinois Appellate Court for the First District stated in *People v. Moorhead* (1st Dist. 1974), 17 Ill. App. 3d 521, 526, 308 N.E.2d 381:

"To justify a 'stop' a 'police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion' [*Terry v. Ohio* (1968), 392 U.S. 1, 21, 20 L. Ed. 2d 889, 88 S. Ct. 1868]. In evaluating the reasonableness of the 'stop' the Court in *Terry* declared that the facts must be judged against an objective standard, to wit:

'[W]ould the facts available to the officer at the moment of the seizure * * * "warrant a man of reasonable caution in the belief" that the action taken was appropriate?' 392 U.S. at 22, 20 L. Ed. 2d at 906."

In the instant case, Deputy Pavnica was aware at the time defendant's vehicle was stopped, that an armed robbery perpetrated by a black man had occurred on August 26, 1975; that the robber had been observed prior

to the robbery in an orange Vega similar in description to defendant's vehicle; and (according to his testimony) that not too many cars of a similar description were driven by black men in the area. When the officer observed defendant's vehicle driven by defendant, a black man, the officer inferred that defendant had committed the robbery. We note that the stop of defendant included merely a check of defendant's identification, and a request that he allow his photograph to be taken. We conclude that the officer's inference that defendant had committed an offense was reasonable under the circumstances and the result of legitimate investigatory police work, and that such inference justified the officer's stop of defendant's vehicle.

■■ Defendant argues that due to the period of time between the date of the reported armed robbery (August 26, 1975) and the date of the stop (September 8 or 12, 1975), and the disparity between the place of the robbery and the place of the stop, the officer's inference that defendant had committed the robbery was unreasonable. We do note that many stops pursuant to section 107—14 do involve stops made more proximate in time and locale to those of a suspected offense than in the instant case. The reasonableness of an investigatory stop must, however, be judged by the circumstances of each particular case. (Ill. Rev. Stat. 1975, ch. 38, par. 107—14.) In the instant case, defendant had been observed in the described vehicle prior to, and in a situation distinct from, the suspected offense. Deputy Pavnica, having interviewed the robbery victim and having been on the look-out for a vehicle of the described type, was aware that few black men drove cars of similar description in the area. The stop was founded on valid investigatory techniques, and was not arbitrary or capricious. The intrusion on defendant occasioned by the stop was minimal. We conclude that the facts available to the officer at the moment of the stop were sufficient to warrant a man of reasonable caution in the position of the deputy to entertain the belief that the action taken was appropriate.

■■ We further note that prior to making the stop, the officer noted the license number of defendant's vehicle, that a check of that number revealed the vehicle was registered to defendant, and that the Will County sheriff's files contained a picture of defendant taken November 29, 1973. In a similar situation, the Illinois Appellate Court for the First District stated, in *People v. Horton* (1st Dist. 1977), 49 Ill. App. 3d 531, 532-533, 364 N.E.2d 551:

> "Although the chain of events in this case shows that the discovery of defendant's 1973 fingerprints was a result of police action following the granting of the first motion to suppress, the fact remains that the police would have inevitably found the 1973 fingerprints during their investigation. Turning back to the

moment before the illegal arrest * * * the Chicago police knew the license number of the automobile which was parked near the burglarized home, and knew that the car was registered to defendant. The police also had fingerprints recovered from the crime scene. It was inevitable that had the investigation progressed in a lawful fashion, the police would have then found defendant's 1973 fingerprints on file, to be compared with the crime scene fingerprints."

As applied to the instant case, even if the stop in the instant case had been illegal, the police, due to information available to them prior to the stop, and the existing photograph of defendant on file, would, inevitably, have been able to proceed with the investigation effectively to establish the guilt of defendant.

Accordingly, the judgment of the Circuit Court of Will County is affirmed.

Affirmed.

BARRY and SCOTT, JJ., concur.